UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                                 )
           Plaintiff,        )
                                 )
      vs.                  )
                                 )    Case No. 4:05CR00022 SNL (AGF)
NICOLE FULSOM,          )
                                 )
          Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendant, Nicole Fulsom. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence and a motion to suppress statements. (Doc. Nos. 13 & 14). The trial is scheduled for Monday, August 29, 2005, at 9:30 a.m.

An evidentiary hearing was held on July 11, 2005. The government was represented by Special Assistant United States Attorney Sirena M. Wissler. Defendant was present and represented by her attorney, James P. Towey, Jr. At the hearing, the government presented the testimony of Sergeant Stacy Thomas ("Tom") Murley, with the St. Louis County Police Department. The Defendant also testified in her own behalf. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

# FINDINGS OF FACT

Sergeant Murley is assigned to the Bureau of Drug Enforcement and has been an officer with the St. Louis County Police Department for 23 years. In June 2002, he was a member of the Methamphetamine Precursor Diversion Task Force (MPDTF), and is currently in charge of that unit. The MPDTF was formed because the officers had been receiving calls from retail stores reporting suspicious purchases of cold medicines containing pseudoephedrine, involving either large amounts or repeated purchases by the same individuals. Pseudoephedrine is a necessary ingredient used in the manufacture of methamphetamine, and any type of cold pills containing pseudoephedrine can be used for that purpose. In response to the methamphetamine problem, the state of Missouri enacted a statute limiting the number of boxes of cold medicine containing pseudoephedrine an individual could purchase at one time; in June 2002, the limit was three boxes.

The MPDTF conducts surveillance at various retail locations to monitor the purchases of pseudoephedrine. At the time of his testimony, Sgt. Murley had been involved in approximately 330 investigations of this nature, and the MPDTF had arrested approximately 516 persons involved in the unlawful purchase of methamphetamine precursors. Based upon their interview of suspects and their observations, the members of the unit had developed significant intelligence regarding the manner in which pseudoephedrine shopping occurs. In June 2002, the MPDTF had been in operation for almost six months.

On June 20, 2002, Sgt. Murley was conducting surveillance at the Target store on Kirkwood Road, together with Detectives Will, Kennemann, and Verhaeghe. Sgt.

Murley was stationed in the security area of the store and observing the aisle containing the cold medicines with the store's closed-circuit cameras. At approximately 9:40 p.m., he observed a female, later identified as Defendant Fulsom, enter the cold medicine aisle. She was talking on a cell phone and picked up three boxes of cold tablets containing pseudoephedrine. She then left the area, but returned and picked up a fourth box. The officers had been unaware of Defendant until she entered the cold medicine aisle and did not know where else Defendant might have gone in the store prior to that time. Sgt. Murley found Defendant's behavior suspicious based upon the number of boxes she took for purchase, and because she was talking on a cell phone throughout the time she was in and returned to the aisle. In the experience of the officers, those engaged in purchasing pseudoephedrine as a precursor often use a cell phone while in the store to obtain directions on what to buy. Sgt. Murley also observed that Defendant did not engage in what the officers called comparison shopping. Based upon their experience, persons who are purchasing cold medicines for legitimate reasons often will pause at the display, considering which medicines to purchase and comparing prices or dosage. Rather than take time to consider what to purchase, Defendant quickly selected three boxes and then returned for a fourth.

Another member of the unit continued to observe Defendant after she left the cold medicine aisle. She went to the checkout and paid cash for her purchases. By this time, Defendant was no longer talking on her cell phone. She was observed having a conversation with the cashier, who permitted her to purchase only three of the boxes of cold medicine. A security officer explained to Sgt. Murley that when an individual

purchases cold medicines regulated by the state statute, the register will automatically alert the cashier if the person is attempting to purchase more than three boxes.  Sgt. Murley assumed that was what happened here.  Defendant in fact purchased one box of Target brand pseudoephedrine and two boxes of Aphedrid, a decongestant and antihistamine also containing pseudoephedrine.  There was no testimony regarding the exact nature of the fourth box that Defendant was not permitted to purchase.  In addition to the cold pills, Defendant had also purchased a bag of gummy bears, a battery for a cell phone, and a bottle of water, although Sgt. Murley did not recall being aware at the time that Defendant had purchased the cell phone battery.[1]

Other officers in the MPDTF who were stationed outside continued to observe Defendant as she got into her car that was parked on the parking lot.  They then conducted mobile surveillance of Defendant, following her as she headed south on Lindbergh to Highway 44 and then went south on Highway 270 and exited at 21.  Defendant pulled onto an Amoco lot at 21 and Concord, where she engaged in another conversation on her cell phone for several minutes.  She did not get out of her car or purchase anything at the gas station.  She thereafter drove to the Schnucks store on Lindbergh and Baptist Church Road.  Defense counsel suggested through cross-examination that there were other drugstores carrying cold medicines along the way that

---

[1] From Defendant's written statement, Govt. Ex. 1, it appears she may actually have purchased the cell phone battery earlier, at Wal-Mart, where she also purchased three boxes of pseudoephedrine.

Defendant passed, but no actual evidence of other such stores was presented. If there were such stores, Defendant did not stop at them.

Det. Verhaeghe followed Defendant into the store and attempted to observe her -- without being seen -- while she shopped. The other three officers waited outside. After she was done shopping, Det. Verhaeghe advised Sgt. Murley that Defendant had begun shopping for a few small items, and that he watched her go down the aisle containing cold medicines but could not see whether she obtained anything in that aisle. Defense counsel suggested, again through cross-examination, that other items were located in the same aisle, including bakeware, contact solution, and CDs, but no testimony to that effect was offered at the hearing. The Court has no reason to doubt such items were located in that aisle.

After she went through the checkout, Defendant returned to her car. Det. Verhaeghe did not observe Defendant in the checkout to see exactly what she had purchased, and therefore did not know whether Defendant had in fact purchased any cold medicines.[2] Following the search of Defendant's vehicle, described below, it was determined that she did not in fact purchase any cold medicines while at this Schnucks store.

Based on their suspicion that Defendant was engaged in the unlawful purchase of pseudoephedrine for use in the manufacture of methamphetamine, the officers arranged

---

[2] The Court is somewhat disappointed that the government did not call Det. Verhaeghe as a witness to describe Defendant's conduct in the Schuncks store and to explain why he was unable to observe her purchases.

for a traffic stop by a uniformed St. Louis County police officer. Officer Halquist initiated the stop on Highway 55 using his marked patrol car, and Defendant pulled over. Officer Halquist parked his car behind Defendant's vehicle, and Sgt. Murley parked behind the patrol car. Initially only Sgt. Murley and Officer Halquist approached Defendant, on the driver's side, while the other officers stayed back. Officer Halquist was in uniform; Sgt. Murley and the other detectives were dressed in jeans and T-shirts, but each wore his identification on a chain around his neck. Sgt. Murley and Officer Halquist advised Defendant that they had pulled her over to conduct an investigation regarding the purchase of pseudoephedrine and asked her to step out of the car. As she was getting out of the car, Sgt. Murley, without entering the car, could see an open bag on the passenger seat that appeared to contain 4-6 boxes of cold medication. For safety reasons, they asked Defendant to move to the area behind her car. Thereafter, Sgt. Murley more closely observed the bag from outside the car and was able to see that there were six boxes of cold medication – three from Target and three from Wal-Mart. He advised Defendant that he believed she was purchasing pseudoephedrine related to the manufacture of methamphetamine, and advised her that she was under arrest for possession of pseudoephedrine with intent to manufacture methamphetamine.

Sgt. Murley took Defendant to his car and seated her in the front passenger seat. She was likely in handcuffs at this time. He advised Defendant of her rights under Miranda by reading the rights to her from a card that he keeps with him. The witness read the rights into the record at the hearing as he had read them to Defendant that night.

Defendant said that she understood her rights, and that she was willing to waive her rights and make a statement.

Defendant orally advised Sgt. Murley that she had purchased the cold medicines and some matches for her boyfriend, who asked her to get them so that he could make methamphetamine. She also advised him that she had not wanted to purchase the cold medicines, and that she and her boyfriend had argued about it several times. She said she had delayed making the purchases because she did not want to do it and because she "did not think he would really do it," but had ultimately agreed.

The officers searched the interior of Defendant's car, but did not find anything further related to methamphetamine production in the interior of the car. In a search of the trunk they found two cases of matches, each containing 2,500 matchbooks. This was significant as the officers knew that the red phosphoreus that is on the striker plates is used in the manufacture of methamphetamine.

At some point while at the scene, Sgt. Murley asked Defendant if she would agree to permit the officers to search her apartment, and she agreed. At the time Defendant waived her rights, she appeared to be of average intelligence and appeared to understand what was being said. She did not appear to be under the influence of any drugs or alcohol or impaired. No threats or promises were made to induce Defendant to waive her rights. Defendant's apartment was nearby and she was transported there in the marked vehicle, followed by the Detectives. Prior to entering the apartment, Sgt. Murley presented Defendant with a Consent to Search form and advised her that she did not have to agree to consent. Sgt. Murley completed the top portion of the form, describing the

area to be searched, and Defendant signed the form and wrote her address.  Govt. Ex. 2.

The consent permitted the search of 4206 Salem School Rd., apt. #10, including "all

rooms, closets, dressers, cabinets [sic] any containers inside the apartment."  The form

permitted the officers to retain any article found that may be used as evidence.  The form

also expressly recited, above the signature portion, "I give my consent voluntarily.  I have

not been threatened, nor have any promises been made to me to obtain my consent."  The

time noted on the consent form was 11:00 p.m.

Before entering the apartment, the officers put on police raid jackets that identified

themselves as officers and also still displayed their police identifications around their

necks.  No other persons were inside the apartment.  During the search, the detectives

located various items associated with the production of methamphetamine.  In the

kitchen, they located a one-gallon plastic jug of muriatic acid, iodized salt, and three

boxes of cold medicine containing pseudoephedrine, with one pill missing from each.  In

a drawer they found an 8½ x 11" sheet of paper that listed four stores, Target, Wal-Mart,

Schnucks, and Dierbergs, with the brand of cold medicines each carried, and the prices.

The officers also located receipts for 20 boxes of cold medicine that had been purchased

on April 20, 2002.  In the closet on the outside deck, the officers located eight bottles of

gasline antifreeze, two one-gallon cans of acetone, and a one-gallon can of Coleman

camping fuel.  In the bathroom, the officers located six unopened boxes of cold medicine

and an aspirin bottle, containing what appeared to be 60 mg. tablets of pseudoephedrine,

which was stuffed into a Mentadent box.  One of the bedrooms was used as an office and

contained a computer, and Defendant advised the officers where her boyfriend kept web sites from which he downloaded information regarding methamphetamine.

At some point after they were inside the apartment, Sgt. Murley reviewed with Defendant the department's Warning & Waiver Form. Govt. Ex. 1. Sgt. Murley explained that he had not reviewed the form with Defendant earlier while at the scene of the arrest, because the officers normally try to leave the highway as soon as possible for safety reasons. At the time Sgt. Murley reviewed the form with Defendant, no other officers were standing with them; he was alone with Defendant. He read each of the rights on the form to her and permitted her to read along with him. He asked her to place her initials along each right if she understood, and Defendant initialed the first four paragraphs which advised her of her Miranda rights. Sgt. Murley then had Defendant read the waiver portion of the form which states:

> I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Defendant executed the form, and noted the date and time, in her own handwriting, as 6/20/02 at 11:30 p.m.

Sgt. Murley discussed with Defendant what they had found in the apartment and seized as a result of their search. He asked Defendant if she was willing to make a written statement, and she agreed. He gave Defendant a copy of the department's Voluntary Statement form, on which he completed the top portion. It identifies Defendant as being 26 years old, and notes a time of 11:35 p.m. as the start time. Govt.

Ex. 3.  Defendant then made a written statement, in which she admitted to purchasing

three boxes from Target that night and three boxes from Wal-Mart.  Defendant also

admitted that over the past couple of months she had purchased approximately 20 boxes.

Defendant dated and signed the form, noting that the statement was completed at 11:57

p.m.  The top of the form, above the space for writing the statement, states as follows:

> I, the undersigned,     Nicole Fulsom    , am   26   years of age, having been
> born on   3-25-76  , in   St. Louis , and who presently resides at    4206
> Salem School Rd., Apt. [illegible]  , have been duly warned and advised
> that I do not have to make any statement at all, answer any questions, nor
> do anything that might tend to incriminate me.  I have been warned that any
> statement that I may make, can and will be used against me in a court of
> law.  I have also been advised of my right to the advice and presence of
> counsel before or during this statement, and that if I am unable to hire
> counsel, one will be appointed for me, without cost or charge to me.
>
> I do not want to talk with an attorney and I hereby knowingly and purposely
> waive these specified rights and declare that the following voluntary
> statement is made without threat of physical harm or coercion, and that no
> promises of any nature have been made by any person(s) whomsoever.

The only officer present with Defendant at the time she waived her rights and executed

the written statement was Sgt. Murley.  At no time did any of the officers display their

weapons, nor did they make any promises or threats to Defendant to induce her to waive

her rights.  Although Defendant appeared worried and upset throughout her encounter

with the officers, she was not inordinately so, and her nervousness did not interfere with

their ability to communicate effectively with one another.

Defendant's testimony at the hearing was limited to the events after she left the

Schnucks store.  In many respects, her testimony does not differ from Sgt. Murley's.  She

testified that immediately after she was stopped, she was told to get out of the car and

was taken to the back of her car.  Officers thereafter immediately began looking through her car, never asking for consent to search her car.  She testified that while at the back of her car, other officers came up and told her that she was going to federal prison.  She admits they told her other things as well, but only that statement stuck in her mind.

Defendant admits that the bags containing the boxes of pseudoephedrine were on the front seat of her car, but asserts that her purse was on top of the bags and that she did not believe the officers could have seen the cold tablets in plain view.   She further admits that she advised the officers that they could search her apartment, but asserts that she was read her rights for the first time inside the apartment, and that she signed the various consent forms while seated in the office in her apartment.  Defendant also asserts that she has been diagnosed with an anxiety disorder, that she advised the officers of her condition, and that she was panicked and crying during the incident.  She also asserted that she did not know that most of the items located by the police during the search were in the apartment.

To the extent that Defendant's testimony differs from that of Sgt. Murley, the Court, after careful observation of the parties during their testimony, credits the testimony of Sgt. Murley.  Defendant's testimony was at times internally inconsistent.  For example, although she initially stated that her purse was on top of the bags containing the cold pills and that she was eating the bag of gummy bears she had purchased at Target while driving, asserting that the officer could not have seen the open area of the bags with the cold pills, elsewhere in her testimony she stated that the bag with the cold pills, the gummy bears, her Walkman, her cell phone, and a bottle of water were all on the

passenger seat, and that "it was all just thrown up on there." Moreover, although she

suggests that she did not sign the Consent to Search form before entering the apartment,

and that she signed all the forms while seated inside the apartment, the Consent to Search

form signed by Defendant reflects a time of 11:00 p.m, while the written Warning and

Waiver Form signed by Defendant reflects a time, in her own handwriting, 30 minutes

later, at 11:30 p.m. Govt. Exs. 2 & 1. Further, the Court does not find either plausible or

credible Defendant's testimony that she was unaware of several of the items located in

the apartment about which she claimed no knowledge.

## CONCLUSIONS OF LAW

Defendant asserts that the officers did not have reasonable suspicion or probable

cause for the initial car stop, and that all of the evidence obtained thereafter must be

suppressed as the fruit of the unlawful stop. She further asserts that any evidence from

the car and statements made thereafter must also be suppressed because Sgt. Murley

could not have seen the six boxes of cold medicine in plain view, and that the car was

searched, without either probable cause or consent, prior to Defendant's arrest. Finally,

Defendant asserts that because of her anxiety disorder and fear, she could not have had

the requisite mental state to waive her rights or provide consent.

### A.  **The Car Stop**

Police officers may briefly stop a vehicle for an investigative purpose when they

have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1,

30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The reasonable

belief requires suspicion based on "'particularized, objective facts which, when taken

together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996). Defendant Fulsom argues that no single action taken by her was unlawful, and that each could have an innocent explanation, but that is not the standard by which the conduct must be judged. Although each factor alone might appear innocent, a combination of factors may warrant further investigation when viewed together. United States v. Sokolow, 490 U.S. 1, 9-10 (1989); United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002).

Here Defendant was observed entering the aisle containing cold medication and immediately taking the limit -- three boxes -- off the shelf. She did not engage in any comparison shopping, which the officers, who are members of a task force that focuses solely on the purchase of methamphetamine precursors, had learned from their experience was unusual with legitimate purchases. She thereafter returned to the cold medication aisle and picked up a fourth box. She was talking on her cell phone the entire time she was in the cold medicine aisle, which the officers also found was commonly done by those purchasing precursor pills. After she left the store, she stopped at a gas station, where she engaged in another cell phone conversation without purchasing anything or

getting out of her car.  Thereafter, she proceeded directly to a Schnucks store, where she shopped further and was seen going down the aisle where cold medicines were displayed.

Based on these facts, these officers, who had unique and extensive experience in this area, had reasonable, articulable suspicion to approach and investigate.  <u>See</u> <u>United States v. Ameling</u>, 328 F.3d 443, 448 (8th Cir. 2003).  <u>See also</u> <u>United States v. Spotts</u>, 275 F.3d 714, 718, 720 (8th Cir. 2002) (reasonable suspicion to stop defendant and ask him to get out of truck where truck had been seen driving by residence that police were searching for methamphetamine lab, and the officers had intelligence reports that the defendant dealt methamphetamine); <u>United States v. Glinton</u>, 154 F.3d 1245, 1257 (11th Cir. 1998) (reasonable cause to stop defendant where driver met with known drug dealer and departed with gym bag).

In connection with the stop, the officers were also justified in asking Defendant to step out of her car.  <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 (1977) (police may order driver to step out of car during routine <u>Terry</u> stop of vehicle); <u>Terry</u>, 392 U.S. at 22-24 (police may stop individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons); <u>Spotts</u>, 275 F.3d at 719 n.2 ("Officers who have conducted a lawful <u>Terry</u> stop of a vehicle may order the driver to exit the vehicle pending completion of the stop.").

### B.  Probable Cause for Arrest and Car Search

The officers did not violate the Fourth Amendment by viewing the front passenger seat of the car when Defendant exited.  <u>United States v. Dunn</u>, 480 U.S. 294, 305 (1987); <u>United States v. Angell</u>, 11 F.3d 806, 807, 810 (8th Cir. 1993).  After Defendant exited

the car, Sgt. Murley saw, in plain view, six boxes of pseudoephedrine-based cold medicine, purchased from two different stores. Under the plain view doctrine, law enforcement officers may seize items without a warrant when (1) they do not violate the Fourth Amendment in arriving at the place where the evidence was viewed; (2) the incriminating character of the objects is immediately apparent; and (3) the officer has a legitimate lawful right of access to the objects themselves. United States v. Weinbender, 109 F.3d 1327, 1330 (8th Cir. 1997). "A law enforcement officer is permitted 'to seize evidence without a warrant when the initial intrusion is lawful, the discovery of the evidence is inadvertent, and the incriminating nature of the evidence is immediately apparent.'" United States v. Murphy, 261 F.3d 741, 743 (8th Cir. 2001), (citing United States v. Raines, 243 F.3d 419, 422 (8th Cir. 2001), cert. denied, 532 U.S. 1073 (2001)); United States v. Winters, 221 F.3d 1039, 1041-42 (8th Cir. 2000) (officer who put head inside car to assure own safety, and smelled marijuana, thereby obtained probable cause to search the car and its containers). See also United States v. Thomas, 249 F.3d 725, 730 (8th Cir. 2001). As such, the Fourth Amendment was not implicated by the officers' observation and seizure of the pseudoephedrine. United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

At this point, the officers also acquired probable cause to arrest Defendant and search her car. The arrest of a defendant is lawful even if made without a warrant if it is made with probable cause. See United States v. Watson, 423 U.S. 411, 417 (1976). This is true even when the offense alleged occurred outside of the presence of law enforcement officers. Id. at 418. A police officer may make a warrantless arrest when he

or she has probable cause to believe a person has committed a crime.  Probable cause exists "when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested."  United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001).  Accord United States v. Travis, 993 F.2d 1316, 1323 (8th Cir.), cert. denied, 510 U.S. 883 (1993) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  Officers are not required to rule out all innocent explanations, nor are they required to be able to prove a case beyond a reasonable doubt to effect a warrantless arrest.  Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("the probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances"); Illinois v. Gates, 462 U.S. 213, 235 (1983) ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision.").  As the Eighth Circuit has observed, "We assess probable cause from the viewpoint of a reasonably prudent police officer, acting in the circumstances of the particular case.  We remain mindful that probable cause is a practical, factual, and nontechnical concept, dealing with probabilities."  United States v. Crossland, 301 F.3d 907, 911 (8th Cir. 2002).  Moreover, in "[m]aking this determination, the court may consider the collective knowledge of all others involved."  United States v. Morgan, 997 F.2d 433, 435 (8th Cir. 1993); United States v. Rich, 795 F.2d 680, 682 (8th Cir. 1986).

Although far from a strong case of probable cause, in light of the quantity of pseudoephedrine found in the car, some of which was obviously purchased from Wal-Mart before the officers first noticed Defendant, coupled with the other conduct observed by officers highly trained in this particular area, the Court finds there was probable cause to arrest Defendant.  See United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (probable cause found, noting the defendant's "actions and behavior, although perhaps seemingly innocuous to the general public, were reasonably suspicions to officers trained to recognize behavior consistent with those of a lookout for a drug deal").

Based on these same facts, the officers were also authorized to search Defendant's car.  See United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000) (smell of marijuana gave officer probable cause to search the vehicle).  Police may search an automobile or other vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband or evidence.  Chambers v. Maroney, 399 U.S. 42, 52 (1970); Carroll v. United States, 267 U.S. 132, 162 (1925).  The Supreme Court "has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts."  United States v. Chadwick, 433 U.S. 1, 12 (1977).  This distinction is based upon the mobility of automobiles and a diminished expectation of privacy associated with the automobile.  United States v. Alden, 576 F.2d 772, 775 (8th Cir.), cert. denied, 439 U.S. 855 (1978).  In such circumstances, the officers may search the entire automobile, including the trunk area, and any items or containers found in the automobile.  United States v. Ross, 456 U.S. 798, 823-825 (1982).

Moreover, inasmuch as Defendant was placed under arrest prior to the search of the car, the officers were also justified in searching the passenger compartment of the car incident to the arrest.  New York v. Belton, 453 U.S. 454, 460 (1981); United States v. Williams, 165 F.3d 1193, 1195 (8th Cir. 1999) (police may search passenger compartment of automobile and contents of any containers in passenger compartment, when lawful custodial arrest is made of occupant of vehicle); United States v. Caldwell, 97 F.3d 1063, 1067 (8th Cir. 1996); United States v. Snook, 88 F.3d 605, 607 (8th Cir. 1996).  Therefore, neither the pseudoephedrine nor the matches found in the car should be suppressed.

### C.  Statements Made by Defendant at the Scene

To the extent Defendant asserts that the statements made by Defendant at the scene must be suppressed because they resulted from an illegal stop, the argument fails, as the undersigned rejects Defendant's assertion that the detention and arrest of Defendant violated her Fourth Amendment rights.

On this record, the Court also finds that the Defendant knowingly waived her rights, and that her statements at the scene were voluntary.  A defendant may knowingly and intelligently waive her rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.  Colorado v. Connelly, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding

the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). See Dickerson, 530 U.S. at 444.

Here Defendant was orally advised of her Miranda rights prior to making any statements at the scene. She is an adult, who at the time was 26 years old. She did not appear to be under the influence of any drugs or alcohol or to be impaired in any other manner, and indeed had been driving her car and shopping at two different stores. While she was likely nervous, the Court finds no basis, factually or legally, for Defendant's argument that her anxiety disorder deprived her of the requisite state of mind to provide knowing consent. See United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998) (waiver valid despite defendant's claim he was under the influence); United States v. Byrne, 83 F.3d 984, 989 (8th Cir. 1996) (though defendant had taken drugs, behavior showed waiver was voluntary); United States v. Makes Room, 49 F.3d 410, 415 (8th Cir.

1995) (waiver voluntary although defendant was intoxicated when arrested and had average to lower than average intelligence and 8th grade education). Indeed, in response to her attorney's question on direct whether she felt threatened, she responded, "a little bit." She also disclaimed that any promises were made to her, and the Court finds on this record that no threats or promises were made to induce her statement. Only one officer was present with Defendant when she waived her rights at the scene, and none of the officers present ever displayed their weapons. Based on the totality of the circumstances, the Court finds that Defendant's waiver and oral statements were both knowing and voluntary.

### D. <u>Consent Search of the Apartment</u>

It is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. <u>United States v. White</u>, 81 F.3d 775, 780 (8th Cir.) <u>cert. denied</u>, 519 U.S. 1011 (1996); <u>United States v. Miller</u>, 20 F.3d 926, 930 (8th Cir. 1994). However, the consent need not necessarily be knowing and intelligent. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 241 (1973). One need not be aware of his or her right to consent in order to make the consent voluntary. <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990).

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. <u>Chaidez</u>, 906 F.2d at 381. Voluntariness is a fact question to be determined from the totality of the

circumstances present.  Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1974).  The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001).  See United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381.  Among the factors to be considered in examining the environment surrounding the consent, courts examine:  the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred.  United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez, 906 F.2d at 381.  The foregoing factors are not to be applied mechanically, and no single factor is dispositive.  Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F.2d at 381.

Here Defendant admits that she gave consent to the officers to search her apartment, and applying the above factors, the government has met its burden to establish that Defendant's consent was voluntary.  On this record there is nothing to suggest that Defendant's will was overborne.  United States v. Poulack, 236 F.3d 932, 936 (8th Cir.

2001); <u>Miller</u>, 20 F.3d at 930. Defendant had also been read her rights under <u>Miranda</u> prior to giving consent. As in <u>United States v. Montano-Gudino</u>, 309 F.3d 501, 504 (8th Cir. 2002), "there is no evidence other than the detention itself that the consent was not freely and voluntarily given." She thereafter signed a written consent acknowledging that her consent was voluntary, and that no promises or threats had been made. Govt. Ex. 2.

Even if the Court were to accept that the consent form was signed only after they entered her apartment – a fact the Court does not accept – it would not matter. Defendant does not claim that the consent form was not signed prior to the actual search, and the times on the various forms are consistent with the officer's testimony that it preceded the search. Moreover, it would not matter in any event, since Defendant admits that she gave verbal consent to search the apartment prior to leaving the scene of the stop, and that, alone, would suffice to support the search. Defendant was present throughout the search, and never voiced any objections to the search or attempted to withdraw her consent, and indeed, continued to cooperate with the officers after the search. Based on the totality of the circumstances, the Court concludes that Defendant voluntarily consented, both orally and in writing, to a search of the apartment, and further consented, in writing, to the seizure of any evidence found therein.

### E. Defendant's Statements following the Search

Immediately following the search of the apartment, Defendant made both oral and written statements. Prior to making any oral statements, Defendant was again advised of her rights under <u>Miranda</u>, and signed a written Warning and Waiver Form acknowledging both that she understood her rights, and that her decision to waive her rights and answer

questions was voluntary. Approximately five minutes later, she made a written statement, in her own handwriting, and the form signed by her expressly advised her of her rights and of the fact that she did not have to make any statement at all. Govt. Ex. 1. Again, there was nothing about Defendant's state of mind at the time indicating she lacked the ability to provide knowing consent. While there were several officers present at the time, only Sgt. Murley was present with Defendant when she waived her rights and made her oral and written statements. This took place in Defendant's own apartment, while she was seated in her office, and the entire encounter with the officers lasted less than two hours. As such, Defendant's oral and written statements made at her apartment should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Motion to Suppress Statements [Doc. Nos. 13 & 14] be **denied**.

The parties are advised that they have ten (10) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 27th day of July, 2005.